UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

GEFT OUTDOOR, L.L.C.,                   )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )        No. 3:19-cv-00141-JRS-MPB
                                         )
CITY OF EVANSVILLE,                      )
                                         )
                    Defendant.           )

**Entry on Cross-Motions for Summary Judgment**

   GEFT Outdoor L.L.C. ("GEFT"), is an outdoor sign advertiser, who challenges the
Zoning Ordinance (the "Ordinance") of the City of Evansville (the "City"), Indiana, in
this lawsuit.  GEFT intended to erect a digital billboard on property in Evansville
and sought a variance in order to do so.  The Board of Zoning Appeals ("BZA") denied
GEFT variances.   GEFT then sued under 42 U.S.C. § 1983, alleging that the
Ordinance violates the First Amendment as incorporated against the states under
the Fourteenth Amendment.  GEFT claims that the Ordinance is unconstitutional on
its face because it contains content-based regulations and that the permitting and
variance procedures for signs are unconstitutional prior restraints on GEFT's free
speech rights.  GEFT's Amended Motion for Partial Summary Judgment, (ECF No.
94), and Defendants' Cross-Motion for Summary Judgment, (ECF No. 99), are before
the Court.

## I.  Background

In the City, outdoor signs must comply with the City's sign ordinance ("Sign Standards").  The stated purpose of the Sign Standards includes "to . . . provide standards, guidance and direction for sign users and sign designers as to what constitutes appropriate signage within the jurisdiction of the City."  Ord., Ch. 18.140.010(A).  The stated purpose of the zoning code as a whole is "to promote the public health, safety, and general welfare of the City[;] to enhance the use and enjoyment of property[;] and to provide for the regulation of land use in the community, while preserving the right of the individual property owner to use and enjoy his property."  Ord., Ch. 18.05.020.

A "sign" means "an identification, description, display, or illustration which is placed upon, affixed to, painted, or represented directly or indirectly on a building or land and which directs attention to a product, person, business or service."  Ord., Ch. 18.140.020(A)(1).  Within that definition are both an "on-premises sign," which is "a sign directing attention to the use, business, or activity offered or sold as the primary use, business, or activity on the premises where it is located," and an "off-premises sign," which is "a sign directing attention to a product, person, business, or service not offered or sold as the primary use, business, or activity on the premises where it is located."  Ord., Ch. 18.140.020(A)(1)(a), (b).

Under the Sign Standards, "[e]xcept as otherwise provided . . . , it shall be unlawful for any person to erect, construct, enlarge or move any sign, or cause the same to be done without first obtaining an improvement location permit (also known

as a 'sign permit') issued by the Planning Department." Ord., Ch. 18.140.020(B)(1). The City, through the Director of the Area Plan Commission ("APC"), has the authority to issue sign permits. Ord., Ch. 18.195.010(B). The City, through the APC, also has the authority to revoke a permit for a violation of the Sign Standards. Ord., Ch. 18.195.101(A)(2). The standards guiding the APC's decision to approve or deny a sign permit application are found in the Evansville Metropolitan Code, primarily Chapter 18.140, but also in other Chapters. (City's Answer to Interrogs., No. 4, ECF No. 95-6.) The Sign Standards do not specify a time limit for the Director to make a decision on an application for a sign permit. (*Id.*, No. 7 (stating that a sign permit application "will generally be approved or denied within one week").)

The Sign Standards exempt certain signs (the "Exemptions") from the permit requirement:

> (1) Name and Address Identification. Signs . . . which identify the names and addresses of occupants but do not denote commercial activity.

> (2) Flags and Insignias. Flags and insignias of a governmental unit, not-for-profit organization, or church, except in connection with a commercial promotion.

> (3) Integral Identification Features. Names of buildings, date of erection, monumental citations, commemorative tablets and the like when carved into stone, concrete or similar construction or similar material made of bronze, aluminum, or other permanent type construction and made an integral part of the structure.

> (4) Public Signs. Public signs placed on-premises or off-premises by or at the instruction of public officer(s) in the performance of public duty, such as signs to promote safety, legal notices, no trespassing, or traffic signs; public memorial plaques; signs of public historical interest; signs directing people to public and quasi-public facilities; and signs no larger than 18 square feet, placed by a charitable county-wide beautification

3

organization at a landscaped site identifying an adopter of an adopt-a-spot location.

(5) Emergency Signs. On-premises or off-premises emergency signs, such as those used by the fire or police departments.

(6) Political Signs. On-premises or off-premises political campaign signs.

(7) Utility Marker Signs. Utility signs necessary to mark cables and lines for public and private utilities unless such signs are determined to be a hazard by the Executive Director of the Planning Department or by any other governmental agency.

(8) Sandwich Board Signs. For commercial businesses only, one sandwich board sign per business use located on a property does not require a sign permit if it meets the following requirements . . .

(9) Directional Signs. On-premises directional signs are allowed without a sign permit if they meet the following requirements . . .

(10) Window Signs. Window signs are allowed without a sign permit; provided, that all window signs displayed at any one time do not cover more than 25 percent of the total window area for each business use.

(11) Real Estate Signs.

(12) Auction Signs.

(13) Banners.

(14) Pennants, Streamers, Inflatables.

(15) Garage Sale Signs.

(16) Construction Signs.

(17) Sponsorship Signs.

(18) Special Event Signs.

(19) Electronic/Digital Signs that display Time and Temperature or Gas Prices.

Ord., Ch. 18.140.030(C), (D).  Some of these terms are defined in the Sign Standards. For example, "construction sign" is defined as a "sign that contains a message relating to construction work that is in progress or upcoming on the premises where the sign is displayed . . . . "  Ord., Ch. 18.140.020(A)(1)(i).

The meaning of other terms is subject to interpretation.  The Zoning Administrator for the APC testified that a "political campaign sign" is a sign showing that a person is running for office.  (Donna Holderfield Dep. 10, ECF No. 110-2.)[1]  The Zoning Administrator also testified that whether a sign is a political campaign sign or a noncommercial sign turns on the content of the sign and that the decisionmaker's personal judgment comes into play in determining whether a sign is exempt.  (*Id.* at 14–15.)

An applicant who is denied a sign permit can petition the BZA for a variance. Ord., Ch. 18.165.010(A).  The BZA decides whether to grant all petitions for a variance, including petitions for variances from the Sign Standards.  Ord., Ch. 18.165.010(B).  The BZA may grant a variance if it finds the following:

> (1) The approval will not be *injurious to the public health, safety, morals, and general welfare* of the community.

---

[1] The City disputes whether the testimony of the Zoning Administrator and Executive Director of the APC amounts to admissions or concessions of the City.  Under Fed. R. Civ. P. 32(a)(3), an adverse party may "use for any purpose the deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)."  Both the Zoning Administrator and Executive Director fall into this category and are decisionmakers with respect to sign permit applications.  Besides, the City wholly fails to offer any evidence to raise a dispute as to the Administrator's or Director's interpretation of the Ordinance.  Even if not admissions or concessions, these decisionmakers' interpretations of the Ordinance are clearly relevant evidence.  *See, e.g.*, *Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 121, 131 (1992) (in evaluating a facial challenge the court considers the government's own implementation and interpretations).

(2) The use and value of the area adjacent to the property included in the variance will not be affected in a *substantially adverse manner*.

(3) The strict application of the terms of this title will result in *practical difficulties* in the use of the property.

(4) The variance is not a variance of the use of the property.

(5) The petitioner's property is not located in a planned unit development.

(6) The need for the variance is not created by the applicant.

Ord., Ch. 18.165.010(B) (emphases added).  The terms emphasized above are not defined in the Ordinance and their meanings are subject to differences of opinion. (London Dep. 28–29, 31, ECF No. 110-1.)  In granting a variance, the BZA may impose "whatever conditions or limitations are necessary to protect adjacent properties and the surrounding neighborhood and effectuate the purposes of [the Ordinance]."  Ord., Ch. 18.165.010(D).  Although a statute requires the BZA to "fix a reasonable time for the hearing" of a variance, neither the statute nor the Ordinance contains a specific time limitation for the BZA to decide whether to approve or deny a variance application.  (City's Answer to Interrogs., No. 7, ECF No. 95-6; London Dep. 9, ECF No. 110-1.)

If the BZA denies a petition for a variance, the applicant has a right to appeal the decision.  (London Dep. 50, ECF No. 110-1.)  The applicant bears the burden of proof on appeal, and no time limit is provided within which the appeal must be decided. Ind. Code § 36-7-4-1600 *et seq.*

GEFT buys or leases land upon which to construct, maintain, and/or operate signs to be used for the dissemination of both commercial and noncommercial speech. (Aff.

of Jeffrey Lee, ¶ 3, ECF No. 95-1.)  The owner of real property located on Oak Grove Road in the City previously leased to GEFT a portion of that property, which is adjacent to I-69, a major thoroughfare in the City.  (*Id.* ¶ 4.)  GEFT intended to erect a digital billboard displaying both commercial and noncommercial speech on the property.  (*Id.* ¶¶ 5, 7.)  GEFT had a permit from the State of Indiana to erect the digital billboard.  (*Id.* ¶ 6.)

On April 11, 2019, GEFT sought variances for construction of the digital billboard. (Lee Aff. ¶ 11, ECF No. 95-1; Compl., Ex. A, ECF No. 59-1.)  Specifically, the variances were from the minimum spacing distance between off-premise signs, the maximum height of an off-premise sign, and the restriction on an off-premise sign on any undeveloped or partially developed subdivision plat, see Ord., Ch. 18.140.040(N), 18.140.080(C).  (Board of Zoning Appeals Record, 6, ECF No. 43-1.)   The BZA considered GEFT's request and denied the variances.  (Lee Aff. ¶ 12, ECF No. 95-1.) The BZA did not find that the variances "will not be injurious to the public health, safety, morals, and general welfare of the community" or that "the use and value" of the adjacent properties "will not be affected in a substantially adverse manner." (Board of Zoning Appeals Record, at 43–44, ECF No. 43-1.)  In addition, the BZA found no evidence that "strict application" of the Ordinance "will result in practical difficulties in the use of the property"; nor did the BZA find that the need for the variance was not created by the applicant.  (*Id.* at 44.)  GEFT's lease required it to erect a digital billboard within one year of the effective date of the lease, and the lease

was terminated as a result of the BZA's denial of the variances. (Lee Aff. ¶¶ 13–15, ECF No. 95-1.)

On July 22, 2019, GEFT filed this suit against the City and the BZA, alleging that the Ordinance constitutes an unlawful content-based regulation and an unlawful prior restraint in violation of the First Amendment as incorporated against the states. The parties' cross-motions for summary judgment are before the Court for ruling.

## II. Discussion

### A. Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of production. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). That burden consists of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim." *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citing *Modrowski*, 712 F.3d at 1169). If the movant discharges its initial burden, the burden shifts to the nonmovant, who must present evidence sufficient to establish a genuine issue of material fact on all essential elements of its case. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009). The Court must construe all facts and any reasonable inferences arising from them in favor of the nonmovant. *See Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citation omitted).

### B. Standing

The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend I. GEFT argues that the Ordinance violates the First Amendment in two ways. First, GEFT contends that the Ordinance amounts to a prior restraint that vests unbridled discretion in the government officials making permit and variance decisions and lacks procedural safeguards. Second, GEFT contends that the Ordinance contains improper content-based regulation.

The Court first considers GEFT's standing because that is jurisdictional. "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[T]he irreducible constitutional minimum of standing contains three elements." *Id.* at 561. "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (citations omitted).

GEFT brings a facial challenge to the City's Ordinance. Facial challenges on First Amendment grounds lie where a statute "substantially suppresses otherwise protected speech vis-à-vis its plainly legitimate sweep." *Bell v. Keating*, 697 F.3d 445, 456 (7th Cir. 2012) (cleaned up). "Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to

9

prevent the statute from chilling the First Amendment rights of other parties not before the court." *Secretary of State of Md. v. Munson*, 467 U.S. 947, 958 (1984).

Still, the Seventh Circuit has made clear that the requirement that a plaintiff prove standing in every case is not "elided" simply because a plaintiff seeks to facially attack a statute. *Harp Advert. Ill., Inc. v. Village of Chi. Ridge*, 9 F.3d 1290, 1291 (7th Cir. 1993). In *Harp*, the plaintiff brought a facial challenge to a sign ordinance on First Amendment grounds but failed to challenge an equally applicable zoning code's size restriction that would have independently blocked the plaintiff's large sign from being built. *Id.* at 1291–92. The Seventh Circuit wrote, "[a]n injunction against the portions of the sign and zoning codes that [the plaintiff] has challenged would not let it erect the proposed sign; the village could block the sign simply by enforcing another, valid, ordinance already on the books." *Id.* at 1292. In other words, victory in the lawsuit would not redress the plaintiff's alleged injury of not being able to erect its proposed sign. *Id.* Accordingly, the Seventh Circuit held that the plaintiff lacked standing to challenge the sign ordinance under the First Amendment.

Likewise, in *Leibundguth Storage & Van Service, Inc. v. Village of Downers Grove*, 939 F.3d 859 (7th Cir. 2019), the plaintiff brought as-applied and facial challenges to a municipality's sign ordinance, urging the ordinance amounted to a content-based regulation. *Id.* at 860. But the plaintiff failed to show that the physical standards its sign violated were impermissible time, place, and manner restrictions. *Id.* at 862. The Seventh Circuit held that the plaintiff failed to show that success in the suit would redress the noncompliance of its sign. 939 F.3d at 861. Although its brief

10

opinion did not speak in terms of standing, the court wrote, "Leibundguth's problems come from the ordinance's size and surface limits, not from any content distinctions." *Id.*

Many courts applying *Harp* have found that severability of an ordinance is properly addressed during the jurisdictional inquiry for purposes of analyzing the redressability prong of standing. *See Paramount Media Grp., Inc. v. Village of Bellwood*, No. 13-C-3994, 2017 WL 590281, at *6 (N.D. Ill. Feb. 14, 2017), *aff'd on other grounds*, 929 F.3d 914 (7th Cir. 2019); *Covenant Media of Ill., L.L.C. v. City of Des Plaines*, 476 F. Supp. 2d 967, 984 (N.D. Ill.), *decision vacated in part on reconsideration*, 496 F. Supp. 2d 960 (N.D. Ill. 2007); *Lockridge v. Village of Alsip*, No. 03 CV 6720, 2005 WL 946880, at *2 (N.D. Ill. Apr. 18, 2005); *see also Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 801 (8th Cir. 2006) ("The district court properly considered the provisions of the sign code to be severable in making its overbreadth standing determination."). Thus, the Court considers severability of the challenged portions of the Ordinance to determine whether GEFT has standing.

As part of its challenge that the Ordinance is impermissibly content based, GEFT challenges the Ordinance's Exemptions. Even if the Exemptions are content based and unconstitutional, however, they would be severable from the remainder of the Ordinance. The Supreme Court has remarked before that "[s]everability of a local ordinance is a question of state law . . . ." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 772 (1988) (citing *Mayflower Farms, Inc. v. Ten Eyck*, 297 U.S. 266, 274

(1936)).[2]   Severability concerns "whether the infirm provision of a statute is severable, leaving the remainder intact." *City of Hammond v. Herman & Kittle Props., Inc.*, 119 N.E.3d 70, 87 (Ind. 2019) (citation omitted).   That inquiry may be broken down into two questions: (1) "whether the statute can stand on its own without the invalid provision," and (2) "whether the legislature intended the remainder of the statute to stand if the invalid provision is severed." *Id.*   If the answer to either question is negative, "the offending provision is not severable, and the whole statute must be stricken." *Id.*

"The inclusion of a severability clause creates a presumption that the remainder of the Act may continue in effect." *Ind. Ed. Emp. Rels. Bd.*, 365 N.E.2d at 762.   The Indiana Supreme Court has noted before that a severability clause is "only one indication of legislative intent." *Id.* at 761.   However, under the modes of statutory interpretation,

> When Congress includes an express severability or nonseverability clause in the relevant statute, the judicial inquiry is straightforward. At least absent extraordinary circumstances, the Court should adhere to the text of the

---

[2] Why this is so is unclear, especially when—as here—a challenged law does not involve a limiting construction imposed by state courts.  Severability is simply a question of statutory interpretation.  *See Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2349 (2020) (framing inquiry as determining "Congress's 'actual intent' as to severability").  And basic rules of statutory interpretation generally do not change from jurisdiction to jurisdiction. Perhaps that is why *American Association of Political Consultants* favorably cited a case in which the Supreme Court severed, without reference to state severability doctrine, "discriminatory wine-and-cider amendments" from an underlying state statute generally prohibiting the manufacture of alcohol.  *See id.* at 2353 (citing *Eberle v. Michigan*, 232 U.S. 700, 704–05 (1914)).  In any event, the state severability law versus federal severability law issue need not be resolved here.  Indiana's law of severability is not unique.  And, in analyzing severability, Indiana courts draw from Supreme Court caselaw on severability in federal statutes.  *See, e.g.*, *Ind. Ed. Emp. Rels. Bd. v. Benton Cmty. Sch. Corp.*, 365 N.E.2d 752, 761–62 (Ind. 1977) (relying on *Carter v. Carter Coal Co.*, 298 U.S. 238 (1935), which reviewed a federal law).  The Court therefore draws on both state court cases and the Supreme Court's most recent discussions of severability.

> severability or nonseverability clause. That is because a severability or nonseverability clause leaves no doubt about what the enacting Congress wanted if one provision of the law were later declared unconstitutional.

*Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2349 (7-2 holding on this point).  The Supreme Court added that presence of a severability clause thus creates a "strong presumption of severability." *Id.* at 2356.

> The City's Municipal Code contains a severability clause, which states,

> If any provision of any ordinance or the application of any ordinance to any person or circumstance is invalid, the invalidity shall not affect the other provisions or application of any ordinance which can be given effect without the invalid provision or application, and to this end, all sections of ordinances are declared to be severable.

Evansville Municipal Code 1.05.070.  "[F]irm adherence to the text of severability clauses," *Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2356, leads the Court to the conclusion that the City intended that invalid provisions of an ordinance be severed.

GEFT cites two cases for the proposition that the Exemptions cannot be severed because the result would subject previously exempt signs to the permitting process, see *Tipp v. City of Dakin*, 929 N.E.2d 484, 503 (Ohio 2010), and *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1268–69 n.16 (11th Cir. 2005).  However, neither case addressed severability in the context of a severability clause, as present here, which creates a "strong presumption of severability." *Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2356.

Moreover, the Exemptions are only a portion of the Sign Standards.  While severing them would require the City to go through the permitting process for previously exempt signs, the Court believes that the Sign Standards and permitting

process can "stand on [their] own without the invalid provision[s.]" *Herman & Kittle Props.*, 119 N.E.3d at 87. Thus, the Exemptions, even if unconstitutional, would be severable.

The City argues that GEFT's problems arise not from any content-based distinction, but from the content-neutral time, place, and manner regulations that apply to all signs, including exempt signs. The City points to the variances GEFT requested from height, spacing, and undeveloped subdivision regulations, asserting that these are content-neutral regulations. Each of these regulations, however, is dependent on the content of the sign at issue: the spacing and height regulations apply to "off-premises advertising sign[s]," Ord., Ch. 18.140.080(C), and the undeveloped subdivision regulation applies to "off-premises signs," *id.*, Ch. 18.140.040(N). Nothing in the Ordinance suggests that these regulations would apply to on-premises signs; indeed, such signs have lesser place and manner regulations. *See* Ord., Ch. 18.140.080(A). The determination, then, of whether these sign regulations apply to GEFT's proposed digital billboard comes down to the content of that sign—whether it is on- or off-premises. And unlike the Exemptions, the on-premises/off-premises distinction is not severable because it is interwoven in almost every part of the Ordinance. *See, e.g.*, Ord., Ch. 18.140.020(B)(2), (E), (F)(1)(b)–(c) and (2), (D)(8); *id.*, Ch. 18.140.040(N)–(O); *id.*, Ch. 18.140.080(A), (C), (D); *id.*, Ch. 180.140.090(B)–(C), (H)–(I). The Sign Standards cannot stand on their own without the on-premises/off-premises distinction; thus, the provisions with that distinction are not severable. *See Herman & Kittle Props.* 119 N.E.3d at 87. Therefore, GEFT

14

has standing to challenge the Sign Standards as an unconstitutional content-based regulation of speech.

GEFT brings not only content-based regulation claims, but also prior-restraint claims. A First Amendment challenge to a permitting or variance scheme "does not involve the conventional standing requirements." *Weinberg v. City of Chi.*, 310 F.3d 1029, 1043 (7th Cir. 2002) (concluding book peddler had standing to bring prior-restraint claim against City based on licensing ordinances he believed gave City unbridled discretion). "In the area of freedom of expression . . . [a plaintiff] has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not [its] conduct could be proscribed by a properly drawn statute, and whether or not [it] applied for a license." *City of Lakewood,* 486 U.S. at 756 (quoting *Freedman v. Maryland,* 380 U.S. 51, 56 (1965)). In *Freedman*, the Supreme Court explained that "standing in such cases was appropriate 'because of the danger of sweeping and improper application in the area of First Amendment freedoms.'" *Southworth v. Bd. of Regents of Univ. of Wis. Sys.,* 307 F.3d 566, 575 (7th Cir. 2002) (quoting *Freedman*, 380 U.S. at 56).

Severing parts of the Ordinance cannot add in procedural safeguards that are not already part of the Ordinance. Nor can severance of any part of the Ordinance cabin official discretion where that discretion is not already cabined. GEFT has standing to bring a facial challenge to the permitting and variance provisions of the Ordinance as unconstitutional prior restraints. If GEFT can show that those provisions are

unconstitutional, GEFT could put up its proposed billboard as long as it otherwise complies with constitutional provisions of the Ordinance.

Therefore, the Court concludes that GEFT has standing to challenge the Ordinance both as an unconstitutional content-based regulation and as an unconstitutional prior restraint. Prevailing in this action would redress GEFT's inability to put up its digital billboard. The Court now turns to GEFT's challenges.

## C. Count I: Content-Based Regulation

Count I of the Complaint alleges that the Ordinance is an unconstitutional content-based regulation of speech. The First Amendment prohibits the government from restricting speech "because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting *Police Dep't of Chi. v. Mosley,* 408 U.S. 92, 95 (1972)). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.*

The first step in deciding whether a law is content based or content neutral is "determining whether the law is content neutral on its face." *Reed*, 576 U.S. at 165. A regulation of speech is facially content based if it draws distinctions "based on the message a speaker conveys," *id.* at 163, or "singles out specific subject matter for differential treatment," *id.* at 169. For example, "a law banning the use of sound trucks for political speech—and only political speech—would be a content-based regulation, even if it imposed no limits on the political viewpoints that could be

16

expressed." *Id.* (citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

*Reed* and *Barr v. American Association of Political Consultants, Inc.*, 140 S. Ct. 2335 (2020), illustrate how this test for facial content neutrality works.  At issue in *Reed* was a sign code that defined different types of signs based on the subject matter of the sign—temporary directional signs, political signs, ideological signs, and more— and subjected each category to different size and location restrictions.  576 U.S. at 164.  The sign code was obviously content based on its face, the Supreme Court said, since the government invariably had to look at the content of the sign to determine how the sign was to be regulated.  *Id.*  Likewise, *American Association of Political Consultants* concerned a general ban on robocalls to cell phones, from which robocalls to collect government debt were exempted.  140 S. Ct. at 2346.  The Supreme Court said this:

> Under § 227(b)(1)(A)(iii), the legality of a robocall turns on whether it is "made solely to collect a debt owed to or guaranteed by the United States." A robocall that says, "Please pay your government debt" is legal. A robocall that says, "Please donate to our political campaign" is illegal. That is about as content-based as it gets. Because the law favors speech made for collecting government debt over political and other speech, the law is a content-based restriction on speech.

*Id.*

Similarly, here, distinctions within the Ordinance are content based.  First, on-premises and off-premises signs are subject to different regulations.  A sign is considered an on-premises or off-premises sign depending on whether it directs attention to the "primary use, business, or activity on the premises where it is

located." Ord., Ch. 18.140.020(A)(1)(a) (defining "on-premises sign"); *see also id.*, Ch. 18.140.020(A)(1)(b) (defining "off-premises sign"). Thus, the Ordinance would treat a sign in front of a church that says "The Mayor Should Go" as an off-premises sign. But it would categorize a sign in front of a church that says "Find your faith" as an on-premises sign. Distinctions between off-premises and on-premises signs are inherently content based because the government must evaluate the content of the sign (that is, whether the sign relates to activities occurring on-site) to determine whether the sign is an on-premises or an off-premises sign, and each type of sign is subject to different regulations. *See, e.g.*, Ord., Ch. 18.140.020(B)(2) (permit application requirements); *id.*, Ch. 18.140.020(E) (measurement of signs); *id.*, Ch. 18.140.080 (permitted use by district). "The fact that a government official has to read a sign's message to determine the sign's purpose is enough, under *Reed*," to make the law content based. *GEFT Outdoor, LLC v. City of Westfield*, 491 F. Supp. 3d 387, 405 (S.D. Ind. 2020) (collecting cases and finding that a city's on-premises/off-premises distinction was content based); *see also GEFT Outdoor, LLC v. Consol. City of Indianapolis*, 187 F. Supp. 3d 1002, 1016 (S.D. Ind. 2016) (same). The on-premises/off-premises sign distinction is content-based.

Second, certain signs are expressly exempted from the permit requirement. Under the Ordinance, permits are not required for "[s]igns not exceeding two square feet in area which identify the names and addresses of occupants but do not denote commercial activity." Ord., Ch. 18.140.030(C)(1). But whether a sign less than two square feet in area complies with the exemption "depend[s] entirely on the

18

communicative content of the sign." *Reed*, 576 U.S. at 164, because it depends on whether the sign contains commercial messaging or just a name and address—in other words, you have to read the sign to determine how it is regulated. Thus, this Exemption creates a content-based distinction. Similarly, "[f]lags and insignias of a governmental unit, not-for-profit organization, or church" do not need a permit. Ord., Ch. 18.140.030(C)(2). It follows, then, that a flag and insignia of any category other than those listed (say, a person's family's coat of arms) would need a permit. This Exemption also creates a content-based distinction.

Indeed, it appears that all of the Exemptions are content based. *See id.*, Ch. 18.140.030(C). Information like the name of a building, date of erection, or identification of a building as a monument does not need a permit when carved into a "permanent type construction and made an integral part of the structure." Ord., Ch. 18.140.030(C)–(D). A giant etching of "End war" into a building's side face would of course not fall within the exemption. This Exemption therefore creates a content-based distinction. The Exemption for public signs is also content based. Likewise, the Exemption for political signs, which creates a content-based distinction between signs about political campaigns and noncommercial signs that are not about political campaigns; the former does not need a permit while latter does. Ord., Ch. 18.140.030(C)(6).

The City argues that it is not called upon to determine whether a sign falls within an Exemption, and it only needs to decide if a proposed sign complies with time, place, and manner restrictions in the Ordinance. However, the Ordinance has an

enforcement mechanism that allows the City to enforce the requirements of the Sign Standards.  Ord., Ch. 18.140.100.  Thus, if a sign is erected without a permit and it is later determined by the City that the sign is not subject to an Exemption, the City can impose a fine on the violator.   Ord., Ch. 18.140.100(A)(3).   The Zoning Administrator testified that a zoning enforcement officer within the APC was responsible for determining whether signs were exempt from the permitting requirement.  (Holderfield Dep., 12, ECF No. 110-2.)  And the decision of whether a sign is exempt turns on the content of the sign.

The Sign Standards apply different regulations to a sign depending on the communicative content of the sign.  Certain types of signs are exempt from the permit requirement; and on-premises and off-premises signs are subject to different size and location restrictions.  Therefore, like the law regulating signs in *Reed*, the Sign Standards are content based and presumptively unconstitutional.  576 U.S. at 163. As a result, the Sign Standards are subject to strict scrutiny.  *Id.* at 163–64.

The City does not even attempt to argue that the Sign Standards satisfy strict scrutiny.  (See Defs.' Combined Br. 9–15 (addressing only intermediate scrutiny), ECF No. 103.)  Instead, the City submits that because the Sign Standards burden only commercial speech, they are subject to intermediate scrutiny.  According to the City, the signs subject to regulation under the Sign Standards are by definition advertisements and inherently commercial in nature.  (Defs.' Br. 14, ECF No. 103.) But the definition of "sign" as "an identification, description, display, or illustration which is placed upon . . . and which directs attention to a product, *person*, business

20

or service," Ord., Ch. 18.140.020(A)(1) (emphasis added), does not limit regulation to advertisements. A sign directing attention to a person need not necessarily be an advertisement that is economically motivated. Take, for example, "The Mayor Should Go" sign—the speaker may not be economically motivated and the sign's message is not commercial in nature.

In certain contexts, the Supreme Court has held that commercial speech is accorded lesser protection than other varieties of speech. *See, e.g.*, *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557, 562–53 (1980). However, the Supreme Court recently reaffirmed that "[c]ontent-based laws are subject to strict scrutiny." *American Assoc. of Pol. Consultants*, 140 S. Ct. at 2346. In doing so, the Court observed that "courts have generally been able to distinguish impermissible content-based speech restrictions from traditional or ordinary economic regulation of commercial activity that imposes incidental burdens on speech." *Id.* at 2347. The Sign Standards impose more than incidental burdens on speech. Like the law restricting robocalls in *American Association of Political Consultants*, the Sign Standards do "not simply have an effect on speech, but [are] directed at certain content and [are] aimed at particular speakers." *Id.*

Besides, the Sign Standards burden both commercial and noncommercial speech. For example, whether a sign is considered an on-premises or off-premises sign depends on whether the sign directs attention to the "primary use, business, or activity on the premises where it is located." Ord., Ch. 18.140.020(A)(1)(a) (on-premises sign), (b) (defining "off-premises sign" to include a sign that directs attention

21

to a person).  Under this definition, a sign that directs attention to a person, such as a sign saying "We love our school principal Jane Doe" not erected on school property would be considered an off-premises sign.  So, too, a sign on church property that says "The Mayor Should Go" would be treated as an off-premises sign.  Each of these sign examples would be considered noncommercial speech.  Off-premises signs are subject to stricter regulation than on-premises signs, and in at least one respect, are prohibited, whereas the prohibition does not extend to on-premises signs.  *See*, *e.g.*, Ord., Ch. 18.140.040(N) (placement of off-premises signs on any unplatted lot in a partially developed subdivision); *id.* 18.140.080 (permitted use by district of on-premises signs and off-premises signs).  And, the on-premises/off-premises distinction permeates the Sign Standards.  *E.g.*, Ord., Ch. 18.140.020(B)(2), (E), (F)(1)(b)–(c) and (2), (D)(8); *id.,* Ch. 18.140.040(N)–(O); *id.*, Ch. 18.140.080(A), (C), (D); *id.*, Ch. 180.140.090(B)–(C), (H)–(I).  The Court agrees that it is inappropriate to parse regulations, especially since the Sign Standards affect commercial and noncommercial speech, and GEFT is attempting to communicate both types of speech. *See GEFT Outdoor*, 491 F. Supp. 3d at 404.  Therefore, the Court subjects the Sign Standards to strict scrutiny.

Strict scrutiny "requires the [City] to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (quotation and citation omitted).  "[I]t is the rare case in which a speech restriction withstands strict scrutiny."  *Id.* at 180 (Sotomayor, J., concurring in judgment) (quotation and citation omitted).

The City has not even attempted to demonstrate that the content-based distinctions in the Sign Standards survive strict scrutiny. No compelling government interest has been identified. The City cites aesthetics as a significant governmental interest. Even assuming that aesthetics is a compelling government interest as the Supreme Court did in *Reed*, 576 U.S. at 171, the City cannot show that placing greater restrictions on off-premises signs is necessary for aesthetics purposes while subjecting on-premises signs to lesser restrictions is not, *see id.* at 172 ("The Town cannot claim that placing strict limits on temporary directional signs is necessary to beautify the Town while at the same time allowing unlimited numbers of other types of signs that create the same problem."). Thus, the City cannot show that the content-based restrictions in the Sign Standards are narrowly tailored. *See Reed*, 576 U.S. at 171–72 (assuming that aesthetics and traffic safety are compelling government interests, holding that the content-based distinctions were underinclusive and not narrowly tailored to further those interests). Therefore, the Court concludes that the Sign Standards are content based and cannot withstand strict scrutiny.

That brings the Court back to severability. "If the part stricken down is an integral part of the statute essential to the apparent legislative scheme and plan affecting the subject matter dealt with in such a substantial manner that to leave the remaining portions stand would accomplish a result not intended by the Legislature, then the entire law must fail." *Tucker v. Muesing*, 39 N.E.2d 738, 739, (Ind. 1942). The on-premises/off-premises distinction is interwoven in almost every part of the Ordinance. *See, e.g.*, Ord., Ch. 18.140.020(B)(2), (E), (F)(1)(b)–(c) and (2), (D)(8); *id.*,

Ch. 18.140.040(N)–(O); *id.*, Ch. 18.140.080(A), (C), (D); *id.*, Ch. 180.140.090(B)–(C), (H)–(I).  The Sign Standards cannot stand on their own without the on-premises/off-premises distinction.  Thus, the provisions with that distinction are not severable, *see Herman & Kittle Props.* 119 N.E.3d at 87, and that renders the entire Sign Standards unconstitutional on their face.

Accordingly, the Court finds that GEFT should be granted summary judgment on its First Amendment claim in Count I that the Sign Standards are unconstitutional on their face because they constitute an impermissible content-based regulation on speech.  The City will be permanently enjoined from enforcing the Sign Standards.

### D.  Count II: Prior Restraint

In Count II, GEFT argues that the City's permitting and variance scheme is a prior restraint on speech that lacks the substantive and procedural safeguards required.  In response, the City argues only that the variance scheme is not a prior restraint because it does not impose any restrictions on GEFT's speech.  That is not the relevant question for determining whether a law is a prior restraint.  Rather, a prior restraint is any law "forbidding certain communications when issued in advance of the time that such communications are to occur."  *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation omitted).  Prior restraints are "highly disfavored and presumed invalid."  *Weinberg v. City of Chi.*, 310 F.3d 1029, 1045 (7th Cir. 2002) (citations omitted).  But a prior restraint is not per se unconstitutional, and it may pass muster under the First Amendment if it meets one of several exceptions "carved out" by the courts.  *Stokes v. City of Madison*, 930 F.2d 1163, 1168–69 (7th Cir. 1991).

24

The City's sign permitting requirement and variance provisions as applied to sign regulation are a prior restraint. The general rule of the Ordinance is that, "[e]xcept as otherwise provided," no sign may be published unless the City first issues a sign permit. Ord., Ch. 18.140.020(B). Hence, the Ordinance "[gives] public officials the power to deny use of a forum in advance of actual expression." *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).

As the Ordinance meets the definition of a prior restraint, the Court must evaluate the constitutional status of the restraint. As relevant here, two lines of cases have sprouted around prior restraints: one focused on substantive limits on official discretion and one focused on procedural safeguards. Which limits on discretion are required depend on whether the law in question is content-neutral or content based. *See Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322 (2002). All prior restraints—even content-neutral time, place, and manner regulations—must substantively "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Id.* at 323; *see also Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 151 (1969) (a prior restraint must guide the government's discretion with "narrow, objective, and definite standards").

A content-based law, however, must also contain the procedural protections announced in *Freedman v. Maryland*, 380 U.S. 51, 58 (1965). *See Thomas*, 534 U.S. at 322. In *Freedman*, the Supreme Court held that a state's film-review scheme was unconstitutional because it lacked three procedural safeguards: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which

the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 227 (1990) (citing *Freedman*, 380 U.S. at 58–60). Similarly, *FW/PBS* involved a licensing scheme that "target[ed] businesses purveying sexually explicit speech," 493 U.S. at 224, prompting the Supreme Court to require of the challenged regulation variants of two of the *Freedman* safeguards, *see Thomas*, 534 U.S. at 322 n.2. *FW/PBS* clarified that the first two *Freedman* safeguards included a requirement that a "license for a First Amendment-protected business must be issued within a reasonable period of time . . . ." 493 U.S. at 228. According to GEFT, the City's sign permitting and variance processes fail to comply with these prior-restraint principles.

The Ordinance's permitting and variance processes as applied to sign regulations fall short of the requirement that any prior restraint "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas*, 534 U.S. at 322. The permitting decisionmaker's discretion is not guided by "narrow, objective, and definite standards." *Shuttlesworth*, 394 U.S. at 151. As GEFT argues, the decisions of what constitutes an exempt sign, which does not require a permit, and what constitutes a commercial sign, which generally does require a permit, turn on the content of the sign and the decisionmaker's personal judgment. The City has not identified any standard that guides the decisionmaker's judgment as to whether

a sign falls within an Exemption or whether a sign is a commercial or noncommercial sign.

So, too, the Ordinance provides only subjective standards to guide the BZA's decision with respect to granting or denying a variance. *See* Ord., Ch. 18.165.010(B). The standards set forth in the Ordinance, such as not "injurious to the public health, safety, morals and general welfare," and a "substantially adverse" affect, *see* Ord., Ch. 18.165.010(B)(1), (2), are not defined. Yet, these standards are value laden and subject to wide and varying differences of personal opinion. *See, e.g.*, *Lakewood*, 486 U.S. at 769–70 (holding unconstitutional permit scheme in which mayor could issue permits if, in his own judgment, such issuance was "in the public interest," which was merely an "illusory 'constraint[]'" on the mayor's discretion); *Shuttlesworth*, 394 U.S. at 159 (striking permit scheme in which permits' issuance was "guided only by [City Commission's] own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience'"); *Bickers v. Saavedra*, 502 F. Supp. 3d 1354, 1362 (S.D. Ind. 2020) (concluding that procedure for special use permits requiring City to consider "five factors that are value laden and susceptible to wide and varying differences of opinion" conferred unbridled discretion on City). These kinds of vague criteria create too great a risk that the BZA might grant or deny a variance based on whether it likes or dislikes the content or viewpoint of a given sign. Using this subjective variance procedure, the BZA could essentially permit whatever speech (or speaker) it favored and prohibit whatever speech (or speaker) it disfavored.

As troubling, in granting a variance, the BZA may impose "whatever conditions or limitations" it finds "necessary to protect adjacent properties and the surrounding neighborhood and effectuate the purposes of" the Ordinance.  Ord., Ch. 18.165.010(D).  The BZA's ability to impose such conditions "independently violates the prohibition against unfettered discretion."  *See, e.g.*, *Lakewood*, 486 U.S. at 769–70 (holding unconstitutional part of ordinance giving mayor discretion to impose "such other terms and conditions [he] deemed necessary and reasonable" when granting a permit).

The Court concludes that unbridled discretion in the permitting and variance processes allows the rejection of a sign permit or variance request based on the content of the message to be conveyed or on the identity of the speaker, both of which are impermissible.  *See Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 828–29 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.  In the realm of private speech or expression, government regulation may not favor one speaker over another . . . .") (citations omitted); *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 340 (2010) (The First Amendment prohibits laws that "distinguish[] among different speakers, allowing speech by some but not others. . . . Speech restrictions based on the identity of the speaker are all too often simply a means to control content."). Because the Ordinance gives the permitting and variance decisionmakers' unbridled discretion, the permitting and variance schemes as applied to signs constitute an unconstitutional prior restraint on speech.

Moreover, because the Sign Standards are content based, they are also subject to the *Freedman* procedural safeguards. *See Thomas*, 534 U.S. at 322. The Sign Standards do not require that a permit or variance be issued within a reasonable, or any, period of time. *See FW/PBS*, 493 U.S. at 228. Nor do they place on the City the burden of going to court to suppress the speech. *See id.* at 227. Instead, that burden is placed on the applicant that was denied a permit or variance. Thus, the Sign Standards do not provide for prompt judicial review. *See, e.g.*, *XXL of Ohio, Inc. v. City of Broadview Heights*, 341 F. Supp. 2d 765, 802 (N.D. Ohio 2004) (observing that if an applicant seeks an injunction to prevent enforcement of the sign ordinance, the burden of proof is on the party seeking the injunction); *3708 N. Ave. Corp. v. Village of Stone Park*, No. 94 C 7267, 1996 WL 82465, at *6 (N.D. Ill. Feb. 23, 1996) (concluding that the mere fact that a license applicant whose application has been "tabbed" can sue for injunctive relief was insufficient to provide an avenue for prompt judicial review). Therefore, the Court finds that the Ordinance lacks the *Freedman* procedural protections and is an unconstitutional prior restraint.

Severability is not an issue because the Sign Standards as a whole are unconstitutional under the content-based regulation analysis. The Sign Standards will be struck down in their entirety, including the permit requirement in Chapter 18.140.020(B). Because of this, the variance process in the Chapter 18.165 will no longer have any applicability to Chapter 18.140. Accordingly, GEFT will be granted summary judgment on its First Amendment prior-restraint claim in Count II.

## Conclusion

GEFT's Amended Motion for Partial Summary Judgment, (ECF No. 94), is **granted**, and Defendants' Cross-Motion for Summary Judgment, (ECF No. 99), is **denied**.  Summary judgment is **granted** to GEFT on Counts I and II.

The Sign Standards are an unconstitutional content-based restriction on speech. The Sign Standards' permitting process and the variance process as applied to signs lack any procedural safeguards or adequate standards to guide the City's decisions and are an unconstitutional prior restraint on speech.  The City will be enjoined from enforcing the Sign Standards, Chapter 18.140 of the Ordinance, against GEFT or any others.

The Magistrate Judge is requested to meet with the parties to discuss  resolution of Count III, a claim on which neither party sought summary judgment, as well as GEFT's damages.

**SO ORDERED.**

Date: 12/13/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution by CM/ECF to all registered counsel of record

30